DET097679

# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Pamela Suzanne Harnden** )<br><br>Plaintiff )<br>)<br>v. )<br>**Saint Clair County 31st Circuit Court, Probate;**<br>**Judge Elwood Brown, Judge John D. Tomlinson,**<br>**Attorney Referee Peter Shane Burleigh, Clerk**<br>**Christine Regan,** all in their individual and official )<br>capacities )<br>)<br>Defendants )<br>)<br>)<br>_____ )<br>) | Case:2:16-cv-13905<br>Judge: Tarnow, Arthur J.<br>MJ: Grand, David R.<br>Filed: 11-03-2016 At 10:46 AM<br>CMP HARNDEN V. BROWN ET AL (DA) |

**Kidnapping, Gross Negligence, Civil Rights Violations, Civil Conspiracy**


PAMELA SUZANNE HARNDEN
8707 Duce Road
Avoca, Michigan 48006
(810) 387-3257
bpharnden@hotmail.com

DATED: November 3, 2016

1

**Nature of Grievance: Kidnapping, Gross Negligence, Civil Rights Violations, Civil Conspiracy**

We (Robert and Pamela Harnden) took our case to the Federal Bureau of Investigation, Macomb County Office, Michigan, on January 11, 2010 with the allegations of kidnapping, perjury and wrong-doing in the court. The allegations arose from continued abuse of our family by Michigan Department of Human Services, Saint Clair County Prosecutor's Office and Saint Clair County 31st Circuit Court. An abuse/neglect case (08-497) was opened October 22, 2008 and a concurrent second case (given the same case number: 08-497) was opened January 14, 2010, both cases were closed March 15, 2010. After a brief investigation Agents Russell Warlick and Louis Fischetti substantiated our claims and proceeded to open a case on our behalf then made a referral to the Michigan State Police to conduct an investigation. Michigan State Police Trooper Bethany Kraig contacted Plaintiff PH via phone call on/around February 2, 2010 in response to the FBI's request. Trooper Kraig advised our family to move out of the county for our personal safety and that she was forwarding our case. February 25, 2010 I contacted Michigan Attorney General's Office and was advised to seek local remedies first and if unsuccessful then I was to contact the AG's Office again

(audio recording, 25 February 2010, page 3). On March 15, 2010 Saint Clair County Prosecutor Michael Wendling stated that his office was "thick as thieves" with DHS so there would be obvious bias in any possible investigation (audio recording). Robert met with Michigan State Police Detective Patrick Young on December 2, 2010 to again inquire whether the MSP would be investigating our complaints. Detective Young replied that the MSP would not be investigating as the FBI had an open case, however we should take our complaint to the media if we would like attention to our predicament (audio recording). We compiled the evidences that we possessed to the best of our ability while waiting approximately 17 months to receive a completed trial transcript from Saint Clair County 31st Circuit Court (audio recordings, dated court transcripts), within a few days of receipt and according to the instructions from the State of Michigan AG's website we attempted to file our criminal complaints in person at the Lansing, Michigan office in October 2011. We were denied the ability to leave our complaints however we were advised to send them in the mail. The AG's Office took receipt of our criminal complaints October 31, 2011. On January 9, 2012 we were given our case number: 2011-0031278-A. Unfortunately Division Chief Richard Cunningham denied pursuit of the case on March 1, 2012 citing the involvement of the FBI (audio recording, denial letter). We again went to the FBI on March 6, 2012 to present the evidence that we had followed their directives: pursue local and

3

state remedies first.  As the local and state law enforcement agencies refused to

investigate we met the Federal requirements and the FBI could take jurisdiction

under the R.I.C.O. act, our case remained open at the FBI until November 12, 2014

when Agent Christenson called to inform us that since the United States Attorney's

Office continued to refuse the issuance of warrants for a full investigation and

possible arrests, she was obligated to close our case with instruction to contact her

if any future issues arise.  Due to the gathering and attempted gathering of

evidences for criminal charges we were unable to file our civil matters.  As the FBI

discontinued the pursuit of criminal charges less than two years ago, **we are within

all statute of limitations for all civil matters that follow or will be discovered

during the commission of this complaint**.  According to Supreme Court Justice

Thomas:

"Statutes of limitations establish the period of time within which a claimant must
bring an action.  **As a general matter, a statute of limitations begins to run
when the cause of action "accrues"- that is, when "the plaintiff can file suit
and obtain relief**." Bay Area Laundry and Dry Cleaning Pension Trust Fund v.
Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997). (Page 4)

And

"Recognizing that Congress generally sets statutory limitations periods to begin
when their associated causes of action accrue, **this Court has often construed
statutes of limitations to commence when the plaintiff is permitted to file suit.**
See, e.g., Graham County Soil & Water Conservation Dist. v. United States ex rel.
Wilson, 545 U.S. 409, 418 (2005)(Page 15)
(*Heimseshoff v. Hartford,* No. 12-729, United States Supreme Court, Justice
Thomas, December 16, 2013) (emphasis added)

"JUSTICE and ACCOUNTABILITY
Civil suits can hold offenders directly accountable to victims.  These suits give
victims their 'day in court,' regardless of whether there was a criminal conviction
or any prosecution at all."
(*Civil Justice for Victims of Crime,* booklet, page 3, National Crime Victim Bar
Association, Washington D.C.)

## Issue of "Governmental Immunity"

## MCL 691.1407 (2)(c), (5) and (8)(a)

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if <u>all</u> of the following are met:
(c) *The officer*, employee, member or volunteer *conduct does not amount to gross negligence that is the proximate cause of the injury or damage.* (emphasis added)


(5) A judge, a legislator, and the elective or highest appointive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

(8) As used in this section:
(a) "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

The evidences of gross negligence will be discussed and compounded

throughout this complaint and will be found satisfactory to disqualify the

individuals who acted in both their official and individual capacities from any form

of "governmental immunity".

6

**Kidnapping, Gross Negligence, Civil Rights Violations, Civil Conspiracy**

Due to the vast amount of information and violations, this Complaint will be compiled per the individual with the violations discussed together and in chronological order. Upon review of this case it will be found that despite the honored position of judge, attorney referee and court clerk, those mentioned in this suit have willingly participated in a conspiracy with the Michigan Department of Human Services (DHS) and law enforcement agencies in an effort to obtain federal funds by the illegal seizure of children. According to research, DHS receives $4,000-$8,000 per child, per month that is listed as a ward of the State- whether temporary or permanent. The methods to obtain this money include lack of due process, extortion, bribery, ransom demands, cruel and unusual punishments and so on. This process cannot exist without the compliance of the court. Every judge, attorney and officer of the law was administered an oath of office in which they pledged to uphold the Constitution and laws which were written to protect the citizens from the overreaching arm of the government therefore no one is able to claim ignorance of said laws. You will read how Michigan Child Protection Law MCL 722.621-638 is intended to protect the families from governmental abuse by implementing a checks and balance system and how that law is completely ignored at every level. As I have not attended college nor law school and have no training in such matters, this Complaint will contain what I believe to be relevant offenses

from our personal audio recordings, court documents and documents received from DHS. You will find that our rights under the 4th, 5th, 6th, 8th, and 14th Amendments were violated in conjunction with other laws. In regard to our personal audio recordings, the FBI deemed them admissible as Michigan has been determined to be a one-party state. As the recording device was on our person and we were a part of the conversation the recordings were not deemed as eavesdropping.

Sunday, October 19, 2008 was a normal day at our home. We had three biological sons (Bobby-15, Darren- 13, Nathan- 11), two adopted daughters (Nicole from Alabama- 13, Sara- 7 from Kharkov, Ukraine) and three foster-to-adopt children from Indiana (11, 9, 8). My husband, Bob and Bobby had gone to Troy, Michigan to get caught up with work, they returned home around 3:30 pm. At this time Bob's dad came over to work with him, Bobby and Darren as they were fixing the corn picker. Nathan, Nicole, Sara and the other three children were playing outside by riding their bikes, in the sandbox and playing football. While playing football Nicole jammed her left ring finger in an attempt to make a catch. This story was told to the guys at the barn by Sara when she was sent there for a time-out. After a while Nicole's behavior was getting out of control so she came into the house with me. She did not mention that her finger was hurt, she was just upset with life. I spoke with her and she went back outside to play while I finished

cooking dinner. The rest of the day went on as usual: dinner, relax, showers, bedtime.

Monday, October 20, 2008 was the beginning of a 17 month nightmare. Two Saint Clair County DHS **license workers,** Marnie DeBell and Jennifer Hutkowski, went to Frostick Elementary (in Sanilac County) to interrogate the three children under the age of 10. They did not possess any legal authority for this visit. Sara had never been a foster child and the other two children were wards of Dubois County, Indiana. To this day DHS has not admitted why these two license workers were dispatched to the school, however upon reading their notes from the seizure of information it seems as if they were trying to imply that I was withholding food from (starving) the children however the notes demonstrate that the three children all felt they were fed enough food. In fact, our pediatrician was satisfied with the progress the Indiana children were making in our home. The year prior to placement in our home, the children had not gained any weight nor grown taller and they looked sickly. In the few months with our family they were looking healthier, gaining healthy weight and growing. Then it is recorded that Sara said Bobby hit her with a metal rod. It is for this reason that we believe DHS Hutkowski was the reporting person that brought CPS Joseph Linert and DHS DeBell to our home later that afternoon. CPS Linert pushed his way past me at the door demanding to speak with the children- alone. An officer of the law was not

present, there was not an open case against our family, and CPS did not have a warrant. When asked why they were there I was informed that he would tell me when he figured it out. Yes, you read that right, he did not have an official reason to be at our home.

After speaking with the children alone, he determined that Nicole would be his main victim. First a little background on Nicole. She was in the State of Alabama foster system from age 8 until she came to our home at age 13. She would go between foster home and psychological wards at her will. Despite the Alabama workers saying she was not medicated, she was on medications that were strong enough to sedate a horse. She was in special education and therapy in Alabama. After she was placed with us, we worked with our pediatrician to wean her off of the medication, she was placed in mainstream classes where she learned to read and within a few months was earning A's and B's of her own accord. We thought Nicole was finally bonding with our family however she was just waiting for an opportunity to get out. Stability was not normal to her. When CPS Linert gave preference to her and her lies, she was empowered. This is where the story of the "motivational stick" started. No one had heard of such a thing prior to CPS Linert's arrival at our home and his speaking with Nicole. This alleged stick was a pitch fork handle that was missing the fork, so it was at least four feet long. Nicole had accused Bobby of hitting her with it in our breezeway. The breezeway has

10

about four feet by six feet of open space, therefore any reasonable person can deduce that it was physically impossible for such an action. Besides, if you are hit with a pitchfork handle you would have more bruising than the one that is on the top of your hand between the two knuckles where a wedding ring would be.

Needless to say, with dollar signs flashing in his eyes, CPS Linert ordered me to take the five adopted/foster kids and Bobby (there may be an arrest) to the hospital for a well-child check. At this point it should be noted that all eight of our children had regular physicals with their pediatrician/doctor, were observed by mandatory reporters 5-7 days a week and social workers were in our home at least once a month. If there were any issues or concerns there would have been reports, but no reports were ever filed. In fact DHS DeBell had just found our home to be in compliance with foster policies on/about August 28, 2008, that was two months previous.

As he was driving to the hospital, CPS Linert called the Sheriff Department for the possible arrest of our son. The girls were all put in one observation room with me, and the two foster boys were in a room with Bob. Bobby remained in the waiting room of Port Huron Hospital. After speaking with Nicole, Bobby and me [as I kept saying that Nicole (13) was lying, Sheriff Deputy Randal Gobeyn asked Nicole if she would like me to leave so he ordered me to leave the area while he spoke with her] and at the request of CPS Linert, Deputy Gobeyn arrested Bobby

for domestic violence/aggravated assault against his sister.  As his parents we did not grant permission for this arrest.

The children were examined by Physician Assistant Brenda Leverenz.  No treatments were rendered to any child and all children were discharged home. Despite the findings of the Physician Assistant and without court orders or any form of legal authority, CPS Linert proceeded: to have the Indiana children removed from our care and sent to another foster home without the permission of Indiana; he signed some of the discharge papers; he ordered Bobby's arrest; he demanded that we take Nicole to a friend's house for the night as he would not allow any type of relative placement; he sent Sara home stating that she was safe.


**Attorney Referee Peter Shane Burleigh (PSB)**, in his individual and official capacity

The Attorney Referee is the first person of the court that the respondent parents encounter in the courts, therefore he has the greatest burden to enforce the laws and protocols.  However as will be disclosed, PSB colludes with DHS in the government sanctioned kidnapping of children.

Tuesday, October 21, 2008: Bobby's Preliminary Hearing, case # 08-488 DL.

- ○ PSB acknowledged the Sheriff Deputy CPS worker as the bringers of the criminal charges. No prosecutor was present. (trial transcript, page 2, lines 20-26)

- ○ The Deputy admits there were no other visible injuries to Nicole other than her bruised knuckle. (page 5, lines 4-6P)

- ○ MCR 3.936(B)(1) states that if the court finds the juvenile has not been fingerprinted then the court must direct the juvenile to go to the law enforcement agency to be fingerprinted.

  - • As you will recall from the above narrative, fingerprinting had commenced however when the woman at the sheriff department asked my son his age she tore up the card.

  - • The absence of the fingerprint card in the court file should have prompted the referee to ask the appropriate questions.

- ○ CPS Linert had photographs that he took at the hospital without the knowledge of the parents. These photos were presented to the court. (pages 6-7)

- ○ PSB: "…we wouldn't be determining jurisdiction here; that would be at pretrial. We'll be determining authorization of the petition-" "-number one, and then placement, number two." (page 7, lines 18-20, 22-23)

- This preliminary hearing was in regard to domestic violence/aggravated assault, a criminal charge, there was not a Child Protection petition against the parents at this time. Therefore I do not understand why the Referee is treating this as a CPS case.

o Upon further questioning by our attorney CPS Linert was uncomfortable and declared, "Yes. I don't- technically, don't need to be at this hearing." Then he continued, "I was asked by Officer Gobeyn to be here for support." (page 10, lines 10-11 and 15-16)

o PSB: "All right. Thank you, Mr. Black. With regard to the petition, the Court does- you know, this is probable cause phase as I've stated, and it appears that (page 17, lines 23-25) there is probable cause to authorize the petition here. It's clearly, based on what I've heard, Nicole had an injury that was treated- was this the emergency room?" (page 18, lines 1-3)

  - Deputy Gobeyn: "Yes, Your Honor." (line 4)

  - PSB: "Okay. Treated at the emergency room. So I am gonna find probable cause to authorize the petition…" (lines5-8)

    - This was a lie by the Sheriff Deputy. The injury happened on Sunday and the children were ordered to the hospital for a well-child check late Monday night by CPS Linert. There were no medical treatments administered to any child at the hospital and

even the altered medical records reflect all children were

discharged home with the parents.  Therefore there was no

concern for their safety by the hospital staff, all of whom are

mandatory reporters.  In fact, the attending Physician's

Assistant testified under oath in July 2009 that the injury on

Nicole's finger was consistent with play.  (trial transcript, page

42, line 13)

- Had proper protocol been followed (due process) my son and our

  family would not be subjected to these violations and lies.

- Had the Sheriff followed protocol and actually interviewed all of the

  eye witnesses for himself and not relied on the hearsay of CPS Linert

  this petition would not have been filed, but it was and now it is up to

  Attorney Referee Burleigh to be sure that the laws and protocols have

  been followed.  The first question that he should have asked is "Why

  isn't the prosecutor here?"  The shame my son endured could have

  been avoided had the checks and balances in place been utilized.

o PSB: "All right.  You indicated you're conducting a separate investigation

  under the child protection law; is that correct?" (page 19, lines 6-8)

- As we were never provided a copy of the Order to Take Child(ren)

  Into Custody, I purchased one at the Court December 11, 2008.  The

copy of this pick-up order indicates that PSB initialed the order on this day.  It also has a case number typed in the petition number box. Since a petition has not been filed against the parents and no court hearings have been held, how was this pick-up order legal and how did they have a case number?

- From the time of our preliminary hearing until January 2009 if you entered our case number into the Court record search our case proceedings would display.  They were entered under the "victims" (children's) names, but the proceedings displayed. After January 2009 our case can no longer be found in Court record searches.   It hasn't been discussed as of yet, but this fact is even more disconcerting when considering the fact our jury trial was July 21, 2009.

- The dates also prove that the Attorney Referee works in conjunction with DHS to kidnap children: The kidnappings could not happen without his authorization.

- Upon review of this pick-up order it will be found that:
  - Line 7 granting "authorization to enter the premises located at" is blank and no specific and identifying information was

entered as to the persons who were to be seized.  This is a blatant violation of the 4th Amendment.

- Please remember that Sara was seized in Sanilac County and this order was issued in Saint Clair County.

- Line 3 declares that "it is contrary to the welfare of the children to remain in the home because: physical abuse by the parents." Line 4 states the "reasonable efforts were made to prevent the removal of the children from the home.  Those efforts include: Referral to Aces Counseling and Catholic Social Services for pre-adoptive assessment."

  - The probable cause clause in the 4th Amendment is very specific.  Warrants cannot be issued without probable cause, an oath needs to be taken and the person that is to be seized needs to be particularly described.  If a hearing has not been held in regard to physical abuse by the parents, then no oaths have been taken and probable cause could not be established.  In fact, had we been allowed our rights to a pre-petition hearing, the Attorney Referee would have learned that DHS had supplied the court with false information to obtain their goal: more

children that bring $4,000-$8,000 per child, per month to their budget.

- Despite the fact that our CPS preliminary hearing was held on October 22, 2008, the petition is dated October 21, 2008. It is curious that the Case Number box is empty, it isn't even hand written. These documents were allegedly "drafted" on the same day. This leads to the most obvious question: Was the pick-up order created after the removal and backdated to make it seem legitimate and legal? The evidence suggests that the pick-up order, initialed by Attorney Referee Peter Shane Burleigh, was in deed manufactured post-deprivation to justify their actions. That is the only way there can be a typed case number in the box.

Shortly after this hearing, CPS Linert called Frostick Elementary School in Sanilac County and requested them to restrict Sara from boarding the bus per her normal routine. Not long after we returned home from the Juvenile Detention Center with Bobby we realized that the bus did not drop Sara off. We panicked. Fortunately someone was in the Superintendent's Office to take our call as it was around 4:30 pm and the buildings are closed. The only information that she was able to obtain was that a guy and a girl went to

the school and took Sara.  It wasn't until 5:19 pm that CPS Linert called our home to tell me that he had both of our daughters and was taking them to a "safe foster home".

- o Wednesday, October 22, 2008 Parents Preliminary Hearing Case 08-497
  - Only our adopted daughters, Nicole and Sara are listed on the petition.
  - According to Saint Clair County's Special Victims Investigative Protocol, which brings the county into compliance with MCL 722.628(6), the Coordinated Investigative Team (CIT) is to work together to investigate, minimize trauma to the victims and ensure the rights of the accused.  (page 4)  Pre-charge interviews are to be conducted with all parties involved in order for the prosecutor to determine the direction of the case.
    - The results of this procedure should be the first thing that the Referee requires to be presented at the preliminary hearing. The fact that the Referee does not even mention such protocols proves that he willingly denies the defendants (respondent parents) their right to due process.
  - During the proceedings it was discovered that:

- CPS Linert stated the "court-ordered" counseling for the Indiana children (not named on the petition) was verbalized to him from the courtesy worker.

- CPS Linert declared that I cancelled the therapy for the children, this is not true, the therapist had to go on maternity leave and was to call for scheduling upon her return.

- CPS Linert is the one who photographed the unclothed children.

- CPS Linert said the biological boys were not abused.

- Guardian ad Litem (GAL) Samantha Lord did not have anything to say to the court. She did not speak with the children until January 14, 2009. This is in direct violation of all mandates and laws in regard to the duties of the Guardian ad Litem and the rights of the children to have an attorney.

- I was given an opportunity to address PSB in regard to the special needs Sara has because she was from an orphanage. I explained my concerns with her education and well-being.

- CPS Linert provided PSB with a court order from Dubois County, Indiana claiming it was ordering counseling. As we have only been supplied with one court order from Indiana, we

assume it was the order that Judge Weikert issued to us, the

foster parents, granting us permission to sign any forms in

regard to the children's psychological/educational/physical

testing.  It was not an order requiring us to perform any specific

tasks, it was an order granting permission.

- CPS Linert and PSB discuss how the Indiana court order was

  used to satisfy the probable cause section of the petition.  As

  pointed out by the Referee and our attorney, the petition did not

  include the Indiana children therefore the information was

  irrelevant thereby removing probable cause.

- Probable cause found, petition accepted.

• Unbeknownst to us there was a concurrent investigation in regard to

possible violations against our foster license by DHS DeBell.  Her

report and CPS Linert's are copied and pasted.  We were not served

notice of this investigation until after we filed our plea January 15,

2009.  Again, we were never interviewed by DHS DeBell, just the

same as CPS Linert.  The State allows the foster parents to object to

the charges, that is what we did.  On October 15, 2009 we participated

in the Compliance Conference which was facilitated by Kelly Maltby

from the Michigan Bureau of Children and Adult Licensing.  In

attendance was CPS Linert, DHS DeBell, DHS Hutkowski and ourselves. This Conference is three months after our trial and almost one full year from the first petition. The State **did not** find us guilty- or in preponderance- of any of the possible violations brought against us therefore our foster license was simply closed administratively as we were placed on the Central Registry pre-conviction however we had the option to open a new license after removal from the registry. Now, if the State Bureau found all of the allegations ludicrous and unfounded- no probable cause against our license in a "court of policy"- then how was the Referee able to find probable cause in a court of law?

- o October 31, 2008
  - CPS Linert made two phone contacts with PSB. Despite the fact that CPS testified that there was no abuse in previous court proceedings, he was requesting to add our biological sons to an amended petition at the Pre-trial hearing on November 6, 2008. According to CPS Linert's report, page 12: "Referee Burleigh inquired as to whether there is evidence that the biological kids were physically abused, and he was informed that there **wasn't evidence** of that." PSB informed him that a determination would be made at the hearing.

- o November 6, 2008 Pretrial Hearing

  - Prosecutor John Walke is present at this hearing.

  - GAL Lord was present and still had not met with the children as required by law.

  - The amended petition that we received at court was still missing a case number and the boys' names were handwritten.

  - Again, the probable cause used by CPS and accepted by the Referee was information that was illegally obtained from the Indiana foster children during interviews at the Child Advocacy Center.

    - After the Indiana children were in our home for one and a half months, they felt safe enough to reveal that they were all sexually abused in the foster home they lived in in Terre Haute, Indiana.  As the children understandably did not like to discuss their pain, we made a video of their stories.  We notified the Indiana worker and provided her a copy of the video upon her arrival for a home visit, the St. Clair County courtesy worker and our pediatrician who conducted an exam then filed a 3200 so that the children could be evaluated by the pediatric specialist for sexual abuse.  At that time we did not have the court order granting permission to authorize such proceedings

therefore Indiana gave permission for the children to be interviewed at the Child Advocacy Center in August.  The children would not give specifics however it was determined that they experienced severe sexual and physical abuse at that home.  I explained all of that to ask: Did DHS obtain the special permission from Indiana to conduct these interviews?  Did DHS bother to cross check the information that the children were saying with the information that was provided to DHS each month that described the very actions the children were accusing us of?  DHS calls this transference.  This is another instance where if due process was required by the Referee, the situation we found our family in would not have existed.

- DHS stated that Referee Burleigh accepts everything: He has proven that to be true.  PSB does not have any regard to the Oath that he swore upon becoming an attorney or referee.

- A pick-up order for our sons was "generated" on this day however at our supervised family time that evening at 6:00 pm CPS Linert stated that he only had a verbal order (which is not legal, *Patrick O'Donnell v. Susan Brown, 5:02-CV-143*) but we were to take our sons next door to their grandparents that night

as he expected to have a copy of the order yet that night. The court was not open therefore I do not understand how that would happen. So, if CPS did not have a copy of the pick-up order for our sons, on what day did PSB initial the order?

  - As with the order for the girls, this order did not specify the persons to be seized.

- November 21, 2008

  - While waiting for a hearing in Judge Elwood Brown's court, CPS Linert admitted that he never interviewed the parents in regard to the petition. (audio recording) This is further proof that the Referee is not concerned with the due process rights of the respondent parents as he did not verify the protocols were followed.

- November 24, 2008 Pretrial Hearing for Bobby's case 08-488

  - Per an unknown to us agreement between the prosecutor and our attorney, Bobby's domestic violence charges were dismissed. (court transcript, pages 3&4)

- January 15, 2009 Pretrial/Plea Hearing

  - Our trial was scheduled for January 20, 2009 and as of January 14th our attorney had not contacted anyone from our witness list nor sat down and had a full interview with us. While I was in trial prep with

our attorney on the 15th he asked me to have Bob leave work in Troy and come to his office to discuss a deal he had reached with the prosecutor.  Part of the deal was that if we would file a plea of responsible our sons would be returned to us that very day (ransom demand).

- We could see there was no hope for a fair trial, therefore in order to have our sons back home with us we agreed to the demands made of us: we filed this plea despite our innocence.

- It was discovered during our May 12, 2009 Plea Reversal hearing with Judge Brown that we were denied the reading of our rights before the plea was filed thereby enabling us to have this plea removed and proceed to trial.

- The Court issued the standard orders for services which included parenting classes, therapy, supplying the court with our financial status, supplying continual proof of employment to DHS, drug and alcohol testing at our expense, DHS was to be the recipient of any government funding that would otherwise be awarded to the children and Bobby was ordered to take Anger Management classes.

o April 9, 2009 Statutory Review

- This hearing was still held despite PSB's absence.

26

- During this review the court was advised that:

  - The parents completed two separate psychological evaluations, neither of which had recommendations for any further services

  - It was recommended that Nicole have a psychological assay to protect the parents. (court transcript, page 8, lines 6-8)

  - Parenting classes were removed as they were not recommended by the psychologist.

  - Bobby completed his classes

  - The girls remained in relative placement.

  - DHS was to still be the recipient of Government funding intended for the children

  - We were never asked to submit to drug or alcohol testing.

  - We were never required to pay the court for the care of our children.

    - Yes, you read that right: the parents needed to be protected from the 13 year old adopted daughter.  This leads back to the original claims: if Attorney Referee Burleigh would have demanded the members of the Coordinated Investigative Team provide proof that they followed the written law and protocols we would not be

at this point: our sons are in our home as temporary court wards, our daughters are still not home and we are falling into financial despair.

- ○ June 22, 2009 Review Hearing
  - This hearing was called to order just to have PSB state that it should have been cancelled as the plea was reversed on May 12, 2009 therefore the case was no longer adjudicated meaning the court did not have temporary wardship and could not give or review orders.

- ○ October 19, 2009 Permanency Planning Hearing
  - We were to continue with the Parenting Classes (the same classes that were removed from our orders in April), Sara was to have a psychological evaluation to determine if she needed therapy, PSB advised that the next review hearing be in sixty days instead of ninety as our orders were almost complete.

- ○ January 14, 2010 Preliminary Hearing
  - Just as with the first case, this second case did not follow law or protocol and the Referee did not ensure that our right to due process was granted.
  - This case alleged that Bob inappropriately disciplined Nicole using what was termed sexual abuse prior to her removal and the first case.

- There were no criminal charges.
- This also violates the double jeopardy clause in the 5th Amendment.
  - We were charged with inappropriate discipline in the first case.
- This second petition asked for termination of our parental rights to Sara.
  - Over the course of time DHS on multiple occasions advised us that if we ever decided that we no longer wanted Nicole to come home, we just needed to ask. After Nicole was placed in relative care she realized that DHS did indeed lie to her and she would be coming home.  This triggered her past behaviors to resurface. She started to regularly inflict physical harm to Sara, her lying became even greater, she had Sara pack her bags to run away with her, however when she asked how deep she needed to plunge a knife in our chests to kill us and threatened to take our sons away from us forever because DHS listens to her and not us, we called DHS and asked

to relinquish our parental rights to her.  The

relinquishment hearing was August 15, 2009.

- Sara was just allowed to move home as a temporary court

  ward one month previous: December 14, 2009.

- The boys were released as court wards on December 14,

  2009.

■ The probable cause that was presented to the court for this

petition was Nicole's alleged statements to a therapist and the

Child Advocacy Center on/around December 29, 2009.  CPS

Jennifer Henderson stated that she believed Nicole's statements

were credible even after DHS stated multiple times that they

knew Nicole lies.  (audio recordings)

■ PSB allowed me to make a statement to the Court.  I explained

all of the services we had successfully completed over the year;

how on August 11, 2009 DHS asked us how we were going to

protect ourselves from Nicole because it wasn't a matter of if

she was going to do this to us again, but when; how CPS

Henderson's petition did not match what she discussed with us

at our home; that DHS was aware of her erotic behaviors while

in relative placement; that we made DHS aware of the notebook being used against us in the spring of 2009.

- Despite the Referee's admission that the statements of Nicole may not be true, he authorized the petition stating that "conflicting evidence could be resolved in a trial" (court transcript, page 10, lines 11-12)

- CPS Henderson requested the court to order another round of in-home services (the first round was just successfully completed two days prior to this hearing, the provider had no concerns with our family). It should also be made known that those in-home services were implanted by DHS without a court order.

  - PSB **did not** order in-home services as the case was not adjudicated.

    - o CPS Henderson called me that afternoon and demanded that we allow the in-home services or they would immediately remove Sara from our home. We paid the price and the non-ordered services resumed the following day.

- The acceptance of this case without care for due process again validates the statement from DHS: That Burleigh accepts everything.

  - With complete disregard that this was a <u>new</u> petition, the court assigned the same case number as our original case.

- January 28, 2010 Pretrial Hearing

  - As this was a new case, we could not afford to pay a new retainer fee to our attorney who was finishing the original case pro-bono therefore we represented ourselves at this hearing.

    - Legally this case was to have a new case number, however it was assigned the same case number as the current case, therefore we should have been able to be represented by our attorney.

    - Due to the "slight of hand" with the case numbers we were now without legal representation on the first case as well. This violated our 6th Amendment rights.

- PSB forced us to be represented by a court appointed attorney. (court transcript, page 6, lines 1-3 and page 8, lines 21-23)

- PSB asked me if I had anything that I would like to say to the Court. I did. I had prepared a statement and inquired how to proceed. PSB

32

took possession of my statement (page 6, line 25, page 7, lines 2-4)

therefore it was not put on record. PSB then stated that he would

place the copy in our court file for future reference. (page 8, lines 8-

9)

- Upon review of our court file sometime after our cases were
  closed, it was found that this letter was not placed in our file.

- The letter mentioned how we had gone to the FBI with charges
  of kidnapping, perjury by CPS Linert and Deputy Gobeyn, and
  wrong-doing in the court.

- This was placed on the trial docket.

This concludes our interactions with Attorney Referee Peter Shane Burleigh.

As the presider of these hearings, the Referee has a great responsibility to ensure

that the rights of both the victims and the accused are not violated and that proper

court procedures are followed. As demonstrated above it is evidenced that

Attorney Referee Peter Shane Burleigh was a party to the proximate cause of

injuries to the Plaintiff, therefore he should not be afforded immunity from this

civil action. It is also evident that the Referee shows prejudice and partiality

towards the Michigan Department of Human Services at all hearings which

suggests that the Referee is a willing participant of the conspiracy to kidnap

children.

Probable cause hearings exist to make logical determinations based on facts. Facts are gathered by conducting investigations, investigations that question all parties involved, not just the party(ies) whose statement can be spun to obtain the desired goals: court custody to obtain federal funding. It was made evident by the persons present during every preliminary hearing conducted in Referee Burleigh's court that these investigations did not take place therefore probable cause could not be granted to the petitioner. If the Referee did not collude with DHS this racket would not exist.

**Judge John D. Tomlinson,** in his individual and official capacity

Judge Tomlinson was the judge who signed the pick-up order for the girls. This order was generated in Saint Clair County to be executed in Sanilac County in regard to the seizure of Sara. This order did not contain specific information to the premises that were to be entered or the persons to be seized.

**Judge Elwood L. Brown,** in his individual and official capacity

We did not have personal inter-reaction with Judge Brown until November 21, 2008 for the first attempt at waiving the 63 Day Rule. As cited above in MCL 691.1407 (2)(5), a judge also has to operate within the scope of his duties and law to maintain his immunity from civil proceedings. The following will exhibit how

Judge Brown disregards the rule of law and willingly participates in the racket run by DHS. Just as in the case of the Attorney Referee, the crimes and violations committed against the respondent parents cannot happen without the co-operation of "upper level" co-conspirators- those who have the authority to process and hide the illegal proceedings. The actions of the judge can be considered more heinous than any of the others as he has spent his career studying and ruling on the law, he is the only actor with the legal ability to authorize court orders, and he was administered an Oath of Office.

The American system of laws has been established with checks and balances and of blind justice. Sadly, the opposite is true. In regard to our family, those checks and balances were never employed and we have yet to be treated fair and just by the legal system. The Racketeer Influenced and Corrupt Organizations (RICO) laws were constructed in an effort to get a handle of organized crime families who influenced government officials, as you can conclude from this case, the RICO laws now apply to the State of Michigan Department of Human Services and the Courts. The kidnapping of our children and the subsequent abuse of our family could not exist without the collusion of the two.

- o November 6, 2008 Order to take children into protective custody
    - The Referee initialed the front page of this order, Judge Brown (JB) allegedly signed this order on the same day.

- As it was described above, we are unsure when this order was actually signed by the judge as at 6:00 pm that evening CPS Linert stated he was not in possession of a legal pick-up order for our sons.
- This order did not specifically describe the persons to be seized.
- The "reasons" to obtain probable cause were lies and we were not allowed to challenge them.

- November 21, 2008 Motion to Waive 63 Day Rule
  - On November 6, 2008, our attorney's office sent a letter to the court (court transcript, page 3, lines15-21) stating that Mr. Black would be on vacation during a certain time (December 12- January 12) therefore he would not be available for trial.  The court scheduled our trial for December 16, 2008 which brought about the need to file this Motion and the eventual delay of trial removing our right to a speedy trial.
  - The motion was not ruled on as our attorney's office did not service notice to the Guardian ad Litem.  The hearing was rescheduled.
  - While waiting for this hearing to commence, CPS Linert admitted that he never had the chance to interview us (the parents) in regard to the charges despite the fact his investigation was open October 20-November 13, 2008.  (personal audio recording)

36

- This statement verifies that due process was not granted by any of the CIT members as protocol states they conduct their interviews together.

o March 16, 2009 Foster Care Review Board Hearing

- The foster care worker made a clerical error in regard to filing a sheet of paper when she was moving our daughters to their grandparents. The foster family that our daughters filed a complaint, we participated in the Review Board Hearing and were not satisfied with their decision (the girls shouldn't be in relative placement or the foster home they just left) therefore we filed an appeal. This appeal was heard in JB's court. The court ruled that the girls could stay in relative placement.

- We released our attorney at this hearing and represented ourselves.

- At the conclusion of this hearing the attending CPS worker filed a 3200 against the foster father's brother (23 years old) for an inappropriate relationship with Nicole (13 years old). The investigation concluded there was a sexually inappropriate relationship between the two. No charges were filed as the girls would not give details.

o May 12, 2009 Motion to Withdraw Plea

- We retained new counsel in March/April in an effort to obtain justice- and our daughters back.

- JB: "So, the Referee failed to comply with 3.971." (court transcript, page 16, line12)

- JB: "For that reason the Motion to Withdraw is granted." (page 17, line 1)

- Judge Brown: "Now, I can tell you this, when I saw a witness list of 130 people, I pretty much was of the opinion without knowing what they were going- a lot of them had to be cumulative. There's no way that you have 130 people who can testify about something different throughout this whole process." Attorney: "I will file an amended witness list and it will be much more succinct, your Honor. I will probably discuss this case with Mr. Walke after the hearing." Judge: "You need to submit an Order." (court transcript, page 17, lines 10-20)

  - The only witnesses we were afforded at our trial was: myself and our three sons who were 16, 14 and 12 at the time. My husband was not allowed to testify in his own- or our- defense.

o June 16, 2009 Motion in Liminae

  - This was filed in conjunction with another motion by the Prosecutor.

- The Prosecution was asking the Court to limit our defense to anything prior to October 19, 2008.  That was the day Nicole's finger was hurt playing football, one day prior to CPS' unwarranted arrival at our home.

  - At the hearing the Prosecutor did not discuss this motion on record.  The record does reflect the title on the cover page and the withdrawal by the prosecutor on page 20, lines 3-7.

- The other motion was seeking the Court's approval to use hearsay testimony at trial to take jurisdiction of our children.

  - The "witness" to the statement was DHS Mandy Dalrymple.  Her role was to make home visits during and report to Indiana on the months that Indiana worker Megan Olds did not fly up to visit.

  - Mr. Biretta (our attorney) objected to DHS Dalrymple testifying to what Ms. Olds said as hearsay.  (court transcript, page 7, lines 13-17)

    - JB: "…It is relevant even though it is hearsay and I'm going to allow it." (page 8, lines 3-4)

- DHS Dalrymple wasn't even next to Ms. Olds and KD when this alleged statement transpired.
    - "I was located- I was with the children, so very close to Megan and KD.  I walked the children over to Megan to meet her." (page 8, lines 17-19)
- KD was 8 years old.  She was a permanent ward of Indiana and was not listed on our petition.  The Court denied us the right to have the child back to the state to cross-examine during trial.  (6th Amendment)
- The alleged statement was that we, the foster parents, put three rounds of duct tape around her legs the night before CPS came to the house.  This statement was never heard of prior to the reversal of our plea in May 2009.  KD was seen at the hospital for a well-child check on October 20, 2008 and neither the original nor altered medical records, the CPS or Foster reports, interrogations at the Child Advocacy Center, etc. ever mention such an event.  This statement was fabricated in an attempt to justify the removal of our children.

- The prosecutor then requested that since they considered us the guardians of the foster children that the Court then allow the photos of them to be used as evidence at the trial. Please remember that the Sheriff Detective finally interviewed us December 19, 2008 and did not file charges of any kind.

- JB cited MCR 3.972(2)(c) as his justification to allow the hearsay testimony. I take issue with this line of reasoning. This Court Rule contains the language: "Any statement made by a child under 10 years of age…regarding an act of child abuse, child neglect, sexual abuse, or sexual exploitation, as defined in MCL 722.622 (f), (j), (w), or (x), performed with or on the child by another person may be admitted into evidence through the testimony of a person who heard the child make the statement as provided in this subrule."

    o KD was not listed on the petition therefore her alleged statement did not qualify as neither the Court nor DHS considered her a victim of child abuse. It does not matter what outcome the co-

conspirators wanted, the law is the law.  This child
was a court ward of Indiana and was not legally
our child, thus the lack of her name on the petition.
The Court cannot simply deem the child ours in
order to gain a desired result.

o  Also, the original, non-altered medical records do
not contain any language in regard to abuse.  If the
physician's assistant had suspected abuse she
would have been mandated to call in the actual
physician.  All children were discharged to their
home which also suggests that the mandatory
reporter did not suspect the bruising was from
abuse.

- JB: "And, therefore, I feel that it fits the requirements of
the Court Rule and will be allowed into evidence." (page
19, lines 23-25)

o  June 23, 2009 Motion to Appoint Separate Guardian ad Litem

- This motion was filed by GAL Samantha Lord the day before our trial
was scheduled to begin.  Her opinions of how the boys should be

feeling were different that theirs therefore she felt she could not represent them.

- The Court granted the motion therefore the boys and the girls had separate Guardian ad Litems.  Remember at this point the boys had been temporary wards placed in the parental home for 6 months.  We were jumping through numerous hoops trying to appease DHS to have the girls returned home.  This filing and granting of this motion further demonstrates what looks like a conspiracy to keep our family broken.

- If the Courts would demand proofs that the pre-charge interviews of all parties, by all parties, were properly conducted, situations like this would not arise.  (5th and 14th Amendments)

o June 24, 2009 Trial

- Trial was postponed as there was a surprise trial proceeding upon our arrival to court that morning.

  - DHS also scheduled a Team Decision Meeting with us for this morning.  This is curious- how did they know that our trial was going to be postponed?  Conspiracy?  Collusion?

  - DHS revealed that they had been conducting another bogus CPS case against our family in an effort to remove the girls

from relative placement.  It was during this meeting that the supervisor stated they were fully aware that Nicole lied but they were taking us to court anyway.  It was also stated that they were not giving our daughters back because they did not want too.  That they were conducting all of these subsequent investigations to make their case look better.  (personal audio transcript, pages13, 47, 48, 71)

- o July 21, 2009 Jury Trial (all quotes are from the Court transcript)

  - Despite the protocol listed in the Special Victims Investigative Protocol and normal practice, we did not have vertical prosecution. Prosecutor Walke handled everything except for the trial and trial disposition hearing.  In his stead was Prosecutor Anna Craprotta.

  - As stated above, I do not have any experience in the schooling or practice of law therefore I can only list the incidents that I feel violated our rights.

  - JB: "Remedial measures that may have taken place since that time are not relevant to your consideration." (page 16, lines 5-6)

    - Judge Brown is admitting that he was aware that court orders were issued and completed.

- Judge Brown interrupted Mr. Biretta (our attorney) during his opening statement to "correct" his statement.  Mr. Biretta was advising the jury that he was "limited to a period of time"(page 23, lines7-8) (Motion in Liminae was supposed to be void, see June 16) and that "The original petition was filed against the oldest of the Harnden children, it was not against my clients." (page 23, lines 10-12) JB stopped him to correct him and inform that the petition was not against anyone specific but requested the court to take jurisdiction.  It was about the allegations contained in the CPS petition, not one specific person. (pages 23 & 24)

  - Mr. Biretta was correct, the first petition was filed against our son, Bobby on Tuesday, October 21, 2008.  The CPS petition against the parents was not filed until Wednesday, October 22, 2008.  Therefore, Judge Brown tampered with our right to a fair trial and impartial jury.  (6th Amendment)

- JB also admits that the petition did not seek all five of our children, just the two.  (page 23, lines 19-21)

  - On multiple occasions state actors informed us that if it is not safe for one then it is not safe for any.  And the opposite: if it is safe for one then it is safe for all.

- ▪ If the above is true, why did the Court authorize the removal of only two of our children?

- The prosecution called the Sheriff Deputy who arrested Bobby for their first witness. He was dressed in "street clothes" and not his uniform. This amounts to nothing less than impersonating an officer of the law- in this case to mislead the jury by presenting himself as a detective.

  - ▪ GAL Lord addresses him as a detective during her questioning. (page 35, line 8) (6th Amendment)

- The Deputy admits that he did not conduct a proper investigation in regard to the allegations made against my son by CPS Linert. (page 31, lines 15-17) (5th and 14th Amendments)

- The Deputy admits that he was at the hospital to investigation our son, not the parents. This trial is for the parents. (page 32, lines 17-21) Bobby's case has been dismissed. (5th, 6th, 14th Amendments)

- JB allowed the prosecution to ask questions of the Deputy and he was allowed to answer in regard to what others said. When our attorney directly asked if Bobby denied hitting his sister with a stick JB instructed the jury to disregard the answer as hearsay. (page 34, lines 24-25) (6th Amendment)

- GAL Lord then asked the Deputy to relay the statements made by Nicole.  Mr. Biretta objected and was overruled.  Judge Brown allowed the hearsay statements.  (page 36, lines 8-9) (6th Amendment)

- I was called in for jury duty one summer and the Circuit Court judge advised the audience that he does not allow police reports in his court as they are nothing but hearsay and therefore not legally admissible evidence.  That is the opposite of what we experienced in Judge Brown's Court.  He allows only hearsay evidence from the prosecutor but the defendants are mandated to provide legally admissible evidence.  This practice violates everything our laws stand for.  The Sheriff Deputy DID NOT investigate us, the parents, he arrested our son, that is all.  Why was he allowed to testify in this trial?  Why wasn't the Sheriff Detective who actually questioned us at the Sheriff Department two months after our children removed called to testify as is normal procedure?  The answer is simple: We were innocent and she could not help the prosecutor's case and when the Court participates in a racket with DHS all of the bases need to be covered.

- Physician's Assistant Brenda Levernz testified that her notes were in regard to Nicole, Sara, Robert, Nathan, this was verified by the Prosecutor.  (page 38, lines 24-25)  The problem with this is Robert

was not observed at the hospital and Nathan was at home therefore

PAC Leverenz could not have notes in regard to them unless given to

her from an outside source.

- Mr. Biretta inquired of the Court as to what notes the PAC was

  using.

- JB asked her if she was using them to "refresh her recollection"

- PAC testified: "They're my notes from the medical records."

  (page 40, lines 9-20)

- As mentioned above, Bobby and Nathan were not evaluated

  therefore medical records did not exist for to support this

  testimony.

- Photos were entered into evidence without a foundation.  Even the

  prosecutor does not know where they came from. (page 42, lines 1-8)

- The PAC testifies that the bruise on Nicole's finger, which brought

  the arrest of our son and his petition of domestic violence, the original

  petition that Mr. Biretta referenced in his opening statement, was

  consistent with play.  (page 42, line 13)

- The PAC continued to testify that the children explained to her that

  their bruises were from falling off of their bikes and playing.  (page

44, lines 1-11) The testimony of the children matches the statements made by the parents.

- The Prosecutor now moves into questioning in regard to the three foster children from Indiana. You will recall that JB is allowing the photos and records to be used as evidence to obtain jurisdiction of our children despite the fact they are not listed on the petition and would not be called back to the state to answer cross examination. (page 44, line 19) (5th, 6th, 14th)

  - The PAC did not have any records with her in regard to the Indiana children. (page 44, lines 19-25)

  - The Prosecutor supplied records "to refresh your recollection". (page 44, lines 24-25) This applied to all three Indiana children.

- JB again allowed hearsay testimony in regard to the children. The PAC testified as to what was written by a nurse and specifically answered no, the statements were not made to her. (page 50)

- Mr. Biretta objected to the admission of the photographs as a foundation had not been laid. JB overruled the objection and allowed the photographs into evidence despite not knowing who took them, when or where. (page 52)

- During cross-examination, PAC Leverenz admits that she did not make notations of abuse on October 20, 2008 when she observed the children.  She was asked by DHS to alter the records on November 5, 2008.  (page 54, lines 1-19)

  - PAC continues to testify that it is against protocol to amend the records then back date them.  (page 54, lines 20-23; page 55, lines 1-18)

- When Mr. Biretta asked PAC Leverenz to read from the nurse's notes, the Prosecutor objected for hearsay.  These were the very same notes that the Prosecutor supplied to the PAC to use for her line of questioning.  (page 56, lines 7-25)  JB then required Mr. Biretta to lay a foundation for the record, JB was not willing to accept his foundation.  A bench conference was called and the parties stipulated that the altered medical records could be entered as respondent's exhibits G & H.  (pages 57 & 58)

- PAC Leverenz testified there was no bruising noted on Sara. (page 62, lines 13-20)

  - This is now two of our children who were listed on the petition that this medical professional testified were not victims of abuse.  This testimony is consistent with the cover page of the

> CPS report and sworn testimony by CPS Linert on page 87,
> lines 1-4 of the trial transcript: no injuries at this time.

- ▪ During research I have read that once the prosecution or the
  Court realizes that the defendants are innocent the case is to be
  dismissed.  That action would afford them their Constitutional
  Rights.

- • DHS Mandy Dalrymple was now called to the stand.  You will recall
  her testimony from the June 16, 2009 hearing in which Prosecutor
  Walke was asking the Court to allow the hearsay testimony.

  - ▪ JB: "The only question from the testimony I heard here today
    that the woman asked was, 'what type of tape did they use?',
    other than that it was simply an indication to the child that,
    'yes, I did see the photographs; yes, I did see that they taped
    your legs.' Simple acknowledgement of the statement made by
    the child.  And the only questions was what did they use which
    was responded to being duct tape." (June 16 Court transcript,
    page 19, lines 4-11)

  - ▪ DHS MD trial testimony: "Katerina continued to ask Megan if
    she had seen the pictures to which **Megan replied that she and**

**asked Katerina** what had happened to her legs." (page 69,

lines 22-25)

- As it is demonstrated the Court allowed the hearsay

  testimony because there were no questions asked by the

  adult however a month later in trial it is revealed that the

  adult did ask the child leading questions.  The Court

  should have stricken this of his own accord as it was a

  violation of his very ruling.  (6th Amendment)

- CPS Linert was now called to testify by the Prosecution

  - Mr. Harnden was mentioned by CPS Linert however he was not

    allowed to testify on his own behalf.  (pages 76-77)

  - Prosecutor: "What was the purpose of calling the police?"  CPS

    Linert: "Whenever we have allegations that there is abuse

    resulting from another minor, that is a law enforcement issue,

    not a Children Protective Service's issue." (page 78, lines 8-11)

    - This testimony validates that the Sheriff had no business

      testifying at our trial as he was not called in regard to us.

  - CPS Linert testified that he was told the bruising on SD was

    from falling on his bike, not being hit by any person.  Generally

when someone's statement doesn't change regardless of who they are talking to it means they are telling the truth.

- Please note that Prosecution did not call any witness to be the accuser of the allegations.
  - We have come to the conclusion that DHS Adoption Licenser Jennifer Hutkowski was the reporting person after she and DHS Foster Licenser DeBell illegally interviewed the children under 10 at the out of county school. This assumption is verified by DHS Amy Sherrod when she stated this whole mess started with licensing on August 11, 2009. (personal transcript, page 36)
  - If this is true, DHS Jennifer Hutkowski should have been called to testify against us. As neither she nor any one else testified against us as an accuser our 6th Amendment rights were violated.
- It is now the respondent parent's turn.
  - I (Pamela Harnden) was called first.
  - Bobby (16 years old) was called.
  - Darren (14 years old) was called.

- During cross-examination Darren mentioned his interview with the Detective at the Sheriff Department. As vertical prosecution was denied in our case, the response of the Prosecutor was one of confusion. (page 139, lines 9-15)

- Nathan (12 years old) was called.

  - Nathan testified as an eye witness to the accidental injury Nicole sustained to her left ring finger while catching a football thrown by the younger foster children. (page 144, lines 2-15)

  - His testimony remained the same under cross-examination. (page 147, lines 10-16)

- Mr. Biretta rested.

- The boys Guardian ad Litem, Julie Reid did not present.

- GAL Lord requested that exhibits 1-24 be published to the jury.

- The Court denied Mr. Biretta's request to publish respondent's exhibits to the jury. This denied our right to a fair trial and impartial jury. (page 152)

- Jury dismissed, lawyers were seen by the Judge in his chambers. (page 153)

- Jury impaneled.

- Closing arguments.

  - The Prosecutor stated that trial was not in regard to the biological boys, just the adopted girls and foster children (not listed on either petition). She admitted the prosecution did not present evidence of abuse for them. (page 171, lines 23-25) Then why did the Court accept a petition with their names on it? Why were they removed from our home for three months until we paid the ransom demand? This is another point that the Court should have stopped the trial and granted us our rights. (page 171, lines 23-25; page 172, lines 1-10)

- Jury sent to the jury room to select a foreperson.

- Court dismissed until 9:00 am July 22, 2009.

o July 22, 2009 Trial, deliberation, verdict and dispositional hearing

  - With only the prosecution's evidence allowed to be seen by the jury and all of the wrong-doing in the court (substantiated by the FBI), it was not too shocking that we would be found in preponderance of the petition.

- CPS Linert then presented recommendations to the Court that were an exact duplicate of the orders we issued and subsequently completed in January 2009.

  - All five children were to be made temporary wards of the court, placed with DHS for care and supervision.

  - DHS would receive any government money afforded the children.

  - The Court reserves the right to charge the parents for the cost of care and services. (We were never charged any fees.)

  - Parents sign releases so the workers can gather information about our children.

  - The parents complete the parenting classes (the same classes the Court removed from our orders April 9, 2009).

  - The parents will submit to another psychological evaluation. (this will be the third since February)

  - The parents file bi-weekly proof of income. (DHS received copies of our pay stubs for a year.)

  - The parents participate in therapy until deemed unnecessary by either the worker or therapist.

- The children participate in therapy until deemed unnecessary by either the worker or therapist.

- The parents contact their worker twice a month to discuss case progress.

- The parents participate and complete an anger management course.

- Visitation would be coordinated by DHS (the boys were home, the girls were still in relative placement).

- The case be reviewed in 90 days.  (pages 4-6)

- Mr. Biretta: "So, I understand it's an Order of the Court but I wondered if they needed the redundancy of doing it again?  I mean it was just done within sixty days. (page 7, lines 11-13)

- Judge Brown: "Is there a need for doing it again?  Let's put it this way, I'm going to require that DHS review their records.  If they've just recently done it and they've complied with that provision then that's going to be sufficient.  If you need additional, you need to ask the Court for additional Orders for that- in that regard." (page 7, lines 14-20)

- Again on pages 8, lines 24-25 and page 9, lines 1-3 Judge Brown reiterated: "Well, because of the confusion associated with this

process that's gone through this, what I'm going to do is require DHS
to re-evaluate their needs as it relates to this particular case. And,
request any additional orders that they need at the next review
hearing."

- JB: "What I'm going to do is follow those recommendations and I
  intend too- if they've already been completed that's one thing. If they
  haven't then they need to be." (page 9, lines 6-8)

- Then the Court asked Mr. Harnden if he had anything to say and
  proceeded to cut him short midsentence. (page 9, lines 10-16)

- Review hearing scheduled for October 19, 2009.

This is when the cruel and unusual punishment becomes extreme. (8th
Amendment) Despite the Court stating the recommendations needed to be
reviewed by DHS and that we were not required to repeat services, the Court
issued all of the recommendations presented by DHS thereby requiring us to
comply with another complete set of orders. With the exception of
completing the 8 week parenting classes, all of the new orders were
completed prior to October 9, 2009. Just as with the previous two
psychological evaluations, Mary Lambe Ph.D. determined that "no evidence
of pathology exists" and did not recommend further services concerning Bob

and I. Dianna Pratt, PsyD assessed our four children and did not recommend any further services.

- o August 15, 2009 Release Hearing
  - Over the entire course of our time in the "system" DHS workers would tell us that if we ever decided that we did not want to have Nicole reunited with our family we just needed to call. (multiple audio recordings)
  - After trial Nicole realized that she would be coming back to our family despite whatever promises were made to her by DHS. Her behaviors intensified and became extremely unstable and dangerous. She then began to ask questions as to how deep a knife has to be plunged in a chest to kill someone and she promised to take our sons away from us for good if we kept fighting to have her in our home. She threatened that she knows the mistakes she made and would not make them again, besides, "DHS believes me, not you". As we needed to consider the safety of everyone in the home we called DHS and requested to relinquish our parental rights to Nicole.
  - DHS Sherrod facilitated the hearing in Judge Brown's court.
  - Our parental rights to Nicole were voluntarily released.

- ○ October 9, 2009 Motion Hearing

  - • Mr. Biretta filed this motion on our behalf.  We were requesting that since none of the three psychological evaluations required further services that the Court allow us to discontinue the classes.  Attending the weekly classes meant that Bob had to leave work 4 hours early putting his employment in jeopardy and we were missing all of Nathan's games.  (page 5) (loss of liberty, pursuit of happiness and familial integrity)

  - • The audio of this hearing is disturbing.  One can hear how Judge Brown speaks to the citizens in threatening tones.

  - • Prosecutor Walke: "Ms. Hazen (DHS worker) has expressed to me that obviously the issues before this Court was not one of the Harnden's not having appropriate parenting skills, but issues of discipline and things of that nature, which-" (page 8, lines 1-4)

    - ▪ If DHS believed we had appropriate parenting skills then why did they recommend and the Court order us to take the classes?

- GAL Lord advised the Court that the very same parenting classes were removed from our orders April 9, 2009 and she was in agreement with the removal. (page 9, lines 2-14)

- Multiple times during this hearing it was mentioned that DHS intended to release the boys as wards and return Sara home at the October 19, 2009 review hearing.

- Judge Brown's threats begin on page 11. He was angry that despite having a jury trial, we (the parents) did not admit to what we were accused of. We never admitted to what was alleged because it wasn't true. I raised my hand and swore to tell the truth and that is what I did. It does not matter if the Judge does not like what the truth is or not: the truth never changes. He stated that he heard the evidence therefore we were guilty. What evidence? The hearsay statement that HE allowed? The hearsay testimony of a Sheriff Deputy that didn't even investigate the allegations against us? The testimony of a CPS worker who did not conduct a proper investigation? The medical records that were admittedly altered by the Physician Assistant at the request of DHS?

His own Orders say that the Court and parents were to follow the recommendations of the DHS workers as they are the people that monitor the progress. He paid no regard to those recommendations and threatened to keep Sara away from us indefinitely because he wasn't "satisfied that either one of these parent's recognize that yet." (page 11, lines 21-22)

We must also remember what was discussed in the dispositional hearing: we were not supposed to be completing redundant orders in the first place that was the reason for this hearing.

- Motion denied.
- Please remember the findings of the State of Michigan Bureau of Children and Adult Licensing on October 15, 2009: the allegations were so ludicrous that she laughed and knew they were fabricated. How is it that the office that regulates policy can review the exact same information and recognize it for what it is: lies, but an officer of the Circuit Court cannot? She stated we should have never lost our children or gone to court. If that is the case then why is this judge demanding an admission in exchange for our daughter's return? (kidnapping, extortion, ransom demand)

- ○ October 19, 2009 Permanency Planning Hearing

  - • This hearing was in Referee PSB's courtroom.

  - • Due to the statements made by Judge Brown on the 19th DHS was no longer asking the court to release the boys as wards and they were not asking for Sara to come home as a temporary ward.

  - • As the orders were almost complete, PSB ordered the next hearing for 60 days instead of 90.

Shortly after this hearing our attorney sent me an email that I was to submit to DHS as a "statement of responsibility" in an effort to satisfy the judge.  I copied and pasted this email and sent it to DHS Hazen.

- ○ December 14, 2009 Permanency Planning Hearing

  - • DHS Hazen recommended that the boys be released as temporary court wards and "That Sara Harnden be returned home with her adoptive parents with Families First Services effective today." (page 5, lines 17-19)

  - • Mr. Biretta objected to the placement of Families First in our home.

  - • Judge Brown decided to follow the recommendations.  (page 7, lines 15-18)

- The 'Order Following Dispositional Review' for Sara did not contain language granting DHS the authority to place Families First in our home.

    - Despite the lack of legal authority, DHS mandated we allow Families First in the home to monitor Sara and myself.

- The case was set for review in 90 days.

Please reference the happenings from December 22, 2009 – January 28, 2010 above, this included the FBI opening an investigation and substantiation of our claims of kidnapping, perjury by CPS Linert and Deputy Gobeyn, and wrong-doing in the court.

o February 16, 2010 Motion to Withdraw as Attorney

- In order for us to be assigned a court appointed attorney as ordered by Referee Burleigh on January 28, 2010, Mr. Biretta was forced to file this motion.

- Please remember that our case (08-497) was still open when DHS filed the second case that asked for termination of our parental rights to Sara.

- Given the fact the court accepted the **second** petition as a new case this withdrawal should not have been required and the second case should have been assigned its own case number.

- This court ordered withdrawal left us without representation on the original case violating our right to an attorney.
- The actions of the court suggest that they were aware of their misdeeds and this was an attempt to cover them up.

o February 26, 2010 Motion Hearing

- Prosecutor Walke filed this motion requesting the Court to determine how he should proceed with the new petition.
    - The petition was already accepted by the Referee and was scheduled for trial which indicates that this case was independent of the first. There should not have been any questions as how to proceed.
- The Court was made aware that by this day Families First had been placed back in our home. A Court order **was not** issued for either time. (page 8, lines 11-12)
- The court appointed attorney could not be found for this hearing. The court found another attorney who was in the building and she represented us. This was not fair or just.
- JB concluded: "Now, that does not mean that the respondent parents are entitled to a jury trial, because they're not. They're only entitled to a jury trial on the issue of jurisdiction. I already have jurisdiction.

So, it's a trial before me, however it would be something new, so it would have to be legally admissible evidence. Hearsay would not be a part of that part of the petition. If the petition contains other basis for termination of parental rights, that would have been involved in the initial petition, I can hear- you're not bound by the legally admissible evidence rule as to those basis only." (page 19, lines 6-17)

- So, after the FBI is investigating wrong-doing in the court DHS and the prosecution all of a sudden have to use legally admissible evidence?

o March 15, 2010 Motion to Withdraw Petition and Permanency Planning Hearing

- The very title of the court transcript verifies that these were two separate cases therefore there should be two different case numbers.

- After personally interviewing Nicole, Prosecutor Walke determined that he could not present legally admissible evidence therefore he was requesting permission to withdraw the second petition. (pages 4 & 5)

- Granted

- In regard to case 08-497: Sara was dismissed as a temporary court ward and the case was closed.

This draws our "official" dealings with Judge Elwood Brown to a close for this time. It has adequately been demonstrated that the actions of Judge Brown were outside the scope of his authority therefore removing his immunity from civil liability. At no point in time did Judge Brown consider the impact his "rulings" would have on all parties involved. As the chief jurist in these proceedings he is responsible for the actions conducted by his staff. Through all of my research into these matters I have found that there is an adequate system in place through laws, rules, policies and protocols that should ensure the rights of the accused and victims. However, as has been revealed in this Complaint, these laws and protocols are disregarded in Saint Clair County therefore our rights were violated at every turn. When our case came to court proof of the pre-charge interviews by all parties should have been demanded. The fact that the detective who interviewed us two months post-deprivation did not find fault with us should have raised the question as to why this case was filed in the first place and then why was it classified as a Category 1?

The only logical conclusion that can be drawn upon the revelation of these actions and the substantiation of kidnapping, perjury and wrong-doing in the court is that there is indeed a conspiracy between the Court and DHS.

Now for my "unofficial" dealings with Probate Court. On May 13, 2014 I filed a grievance with the Attorney Grievance Commission in regard to Guardian

ad Litem Samantha Lord.  As we found that Judge Elwood Brown was the

chairperson of the State Bar Association of Michigan's Judicial Ethics Committee

at the time we were not surprised that the Commission did not find enough reason

in the documents and statements that I sent in to open an investigation despite the

fact she did not follow any of her mandates under the law or protocols.

On June 30, 2014, a mere three days after the Commission denied the

complaint, I received a call from Port Huron Police Detective Sergeant Brian

Georgia.  He called in an effort to have me enter his jurisdiction and provide him

with the digital files in regard to GAL Lord.  Despite my reservations, I initially

agreed and an interview was scheduled for 10:00 am, July 3, 2014 at Port Huron

PD.  (personal audio and transcript) This procedure was not making sense so at

9:12 am on the morning of the meeting I decided to call the Grievance

Commission to ask if they had ordered the PD to investigate my evidences.  I

spoke with Robert Edick, he had to take some information and call back after he

looked into my question.  Needless to say, the Commission did not, and does not in

the course of their normal business, ask other agencies to investigate.  He

proceeded to advise me that I was under no obligation to provide any information

to the PD without proper warrants.  To be polite, I still called the PD to cancel my

appointment, to me the content of this call verified my suspicions of ill-intent.  The

Detective was not at work that day, the meeting was not logged on any schedules

and no one in the office was aware I was to come in.  I was very thankful that I

decided to cancel that day.  We personally know a man who asked Judge Brown to

see his Oath of Office and was subsequently picked up by Port Huron PD and put

in lock up for 10 days without any warrants or court hearings- that was my fear, I

would be put in jail and they would send DHS to take my daughter away again.

Detective Sergeant Georgia did call me on July 8, 2014 and conducted the

interview over the phone.  It was at the beginning of this conversation that our

fears were verified.  I asked the Detective how he got my phone number and who

assigned him to listen to our recordings in regard to the GAL.  Probate Court sent

over a request to investigate me in this regard.  Yes, you read that right: Probate

Court, Judge Brown's Court, sent a request to the Port Huron Police Department to

investigate what evidences (recordings) I possessed against the private attorney,

Ms. Samantha Lord.  I proceeded to explain what our family had gone through

over the last six years and how the FBI was involved and what they substantiated.

As a precautionary measure I had transcribed the relevant conversations and

downloaded the audio to a flash drive and delivered them to Agent Christenson on

July 7, 2014.  There were numerous times the Detective requested that I somehow

get the recordings to him for review.  I concluded by telling him he could contact

the FBI to obtain the information he was seeking as I was not comfortable entering

the premises of the PD.  I have not been contacted by Port Huron PD since this time.


**Christine Regan-** Court recorder

Over the course of time I had ordered several court transcripts.  These transcripts were always produced in a timely manner.  As our cases closed March 15, 2010, I ordered our trial transcript and several others on March 22, 2010.  It will be demonstrated how there was a concerted effort to further obstruct our quest to get justice for our family.

- March 22, 2010: ordered trial and other transcripts

- April 2010: left multiple messages asking of the progress

- May 4, 2010: Ms. Regan finally called back.  She stated she had two big appeals come in and when she gets a break she will return to working on ours.  She asked if we had any hearings that we needed them for.  I told her no but we would like to get things started.

- July 29, 2010: Ms. Regan said she only had a week or a week and a half until the trial was finished.

- September 16, 2010: Four of the transcripts were ready, the trial would need more time.

- September 21, 2010: Ms. Regan called to inform me that part of the trial was done. I picked it up that afternoon.

- November 4, 2010: Ms. Regan returned my call. Two more hearings were done and if we felt we needed a lawyer to help get the trial done then so be it.

- January 20, 2011: Ms. Regan stated the jury trial was almost done.

- May 5, 2011: Ms. Regan returned my inquiry. Ten months after the first claim, Ms. Regan stated the trial should be done in one to one and a half weeks. We also had to clarify some dates. The Court filed the hearing in regard to the dismissal of Bobby's case on November 21, 2008 however the hearing was held on November 24, 2008.

- May 26, 2011: Told the trial transcript would be done in two weeks.

- July 1, 2011: Ms. Regan stated she had an 800 page appeal come in and those come first.

- July 27, 2011: Told jury trial is ¾ done.

- August 15, 2011: Ms. Regan stated there was only half an hour left of the trial so it should only be a few more days.

- August 29, 2011: Ms. Regan called and said her computer crashed.

- September 12, 2011: Ms. Regan called and said she is working on it. She lost parts of it when the computer crashed.

- September 26, 2011: She was trying to be done by Friday.

- September 28, 2011: Ms. Regan said I could come pick up the second
  segment of the trial that was completed.  I purchased this segment
  September 30, 2011.

- October 17, 2011: The jury trial transcript was finally completed.

Therefore, 1 year, 6 months and 26 days after the transcript for our jury trial

was ordered, it was completed.  This is where the assumption of collusion

comes in.  The concern at the beginning was whether we had hearings pending

that would require the transcript.  Yes, we planned on filing civil suits however

the FBI had an open criminal investigation at that time which hindered our

filing therefore we were gathering the documents we felt would be necessary

and would not pose a conflict with the investigation.

Although I have not conducted a side-by-side comparison to all of the

transcripts, and despite the fact that I am not trained in the art, there are multiple

discrepancies between the official court hearing transcripts and my personal

transcripts.  This also poses a threat to justice and our rights as it could

compromise the opinions of judges or other officials who would review the

court transcript in order to verify the claims of the Plaintiff in a suit.  This is

neither fair nor ethical and Ms. Regan should be held accountable for her

actions against our family.  Ms. Regan acted outside of her official capacity by

committing the actions described above and should therefore lose any

immunities she would normally be afforded.

## Brief in Support

As citizens of the United States of America we grow up feeling a sense of safety and security as we are taught the inalienable rights that have been granted to us by the Constitution with the Bill of Rights and the laws that govern our land. Unfortunately situations arise in which it is revealed that the feeling of safety and security was just a myth.  That is what happened to our family.

When we started pursuing adoption we knew it would be hard, but as a family unit we decided that the hard times would be worth it knowing that we could help children that have been abused, neglected or abandoned thereby leaving them alone, with no one to lean on throughout their lives.  These children have been cut to their cores and need a strong family unit that will not give up on them, no matter what behaviors they exhibit- that is what we gave the children placed in our home.  We gave them unconditional love on both their good and bad days. This stability and love was foreign to them and when given the opportunity to have their old normal back, a couple of the children took advantage of the situation.

This is where the checks and balances that I discovered during my research should have protected us.  There are multiple agencies and offices that are required by law to conduct pre-charge investigations: some as a group, others individually. It would then be up to the Courts to ensure the rights of both the accused and alleged victim(s) by reviewing the results of said investigations when the petition

is filed. It has been demonstrated above that none of these laws or protocols were adhered to in my cases. The disregarding of the very first step into the legal system proves the contempt the Courts (actors in their official and individual capacities) possess and the lack of due process.

The fact that the persons committing these violations have graduated college, law school, taken oaths to uphold the state and country Constitutions and were administered Oaths of Office, make the violations that much more heinous and negate any arguments that they are unaware of any laws that pertain to their positions (they cannot plead ignorance). It has been clearly demonstrated how each Defendant has committed gross negligence thereby removing their claims to governmental immunities which now allows this Complaint to move forward.

In regard to the argument of being past the statutes of limitations, as quoted on page 4 of this Complaint, the United States Supreme Court allows the filing of suits to be made when the Plaintiff is allowed to. In our case, this allowance did not occur until after the Federal Bureau of Investigations closed their criminal investigation November 12, 2014.

In closing, it should be noted that despite all of the measures taken, threats and allegations made against myself and my family by the Courts, DHS and all other parties involved, **THE ONLY ALLEGATIONS THAT WERE LEGALLY SUBSTANTIATED WERE THE ALLEGATIONS WE TOOK**

**TO THE FBI: KIDNAPPING, PERJURY AND WRONG-DOING IN THE COURT.** This Complaint focuses on the Court's involvement, and that involvement is contained in all three aspects of the substantiation. DHS cannot kidnap our children without the Court improperly authorizing pick-up orders, not verifying the "information" that DHS presents as how they supposedly tried to stop the removal, the Court then becomes an active participant in the kidnapping by making unreasonable demands on the respondent parents which amounts to nothing less than cruel and unusual punishment, by threatening the parents to make statements or actions or they will never get their children back, etc. The Court is the responsible jurist of all hearings and trials. It is the Court's responsibility to be sure that all parties follow the law and are granted their rights. The Court is not to use their power to sway hearings and trials to their desired results by allowing other state actors to lie under oath, present hearsay evidence when only legally admissible evidence is allowed, denying the rights of the accused to testify on their behalf, denying the accused to face their accuser, etc.: all of which deny the defendant in their court their rights to a fair trial and impartial jury. I am not sure all of the wrong-doing in the court that the FBI agents found but just from reading the events that I have listed above, it should be obvious that wrong-doing abounds in this court. Again, as stated at the beginning, I am not an attorney and have not had any form of legal training, therefore I am positive that the events I listed would

only be the tip of the iceberg if the transcripts were to be reviewed by legal counsel.

I pray this Court finds that this Complaint has satisfied the requirements under MCL 691.1407 to remove the Defendant's immunity from tort liability thereby allowing this case under 42 U.S.C. § 1983 and award Plaintiff compensation of $100,000,000.

Respectfully submitted,

PAMELA S. HARNDEN
8707 Duce Road
Avoca, Michigan 48006
(810) 387-3257
bpharnden@hotmail.com

November 3, 2016

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

County in which action arose _Saint Clair_

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Pamela Suzanne Harnden

**DEFENDANTS** Saint Clair County 31st Circuit Court Judge Elwood Brown; Judge John D. Tomlinson; Referee Peter Deane Burleigh; Christina Regan, in their individual & official capacity

**(b)** County of Residence of First Listed Plaintiff _Saint Clair_
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _Saint Clair_
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pamela S Harnden
8757 Dunard
Avoca, MI 48006    (810) 387-3257

Case: 2:16-cv-13905
Judge: Tarnow, Arthur J.
MJ: Grand, David R.
Filed: 11-03-2016 At 10:46 AM
CMP HARNDEN V. BROWN ET AL (DA)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ❏ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ❏ 2 U.S. Government Defendant | ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only)* and One Box for Defendant

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | of Property 21 USC 881 | ❏ 423 Withdrawal | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | ❏ 690 Other | 28 USC 157 | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | Liability | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| & Enforcement of Judgment | Slander | | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted | Liability | | ❏ 840 Trademark | Corrupt Organizations |
| Student Loans | ❏ 340 Marine | | | ❏ 480 Consumer Credit |
| (Excludes Veterans) | ❏ 345 Marine Product | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | Act | ❏ 862 Black Lung (923) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 190 Other Contract | Product Liability | Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 196 Franchise | Injury | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - | Leave Act | | Act |
| | Medical Malpractice | ❏ 790 Other Labor Litigation | | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ❏ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | ❏ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ❏ 2 Removed from State Court  ❏ 3 Remanded from Appellate Court  ❏ 4 Reinstated or Reopened  ❏ 5 Transferred from Another District *(specify)*  ❏ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC § 1983

Brief description of cause:
Civil Rights Violation

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 100,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE January 23, 2013 November 3, 2016

SIGNATURE OF ATTORNEY OF RECORD
Pamela Harnden

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.　　　Is this a case that has been previously dismissed?　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.　　　Other than stated above, are there any pending or previously
　　　　discontinued or dismissed companion cases in this or any other　☒ Yes
　　　　court, including state court? (Companion cases are matters in which　☐ No
　　　　it appears substantially similar evidence will be offered or the same
　　　　or related parties are present and the cases arise out of the same
　　　　transaction or occurrence.)

If yes, give the following information:

Court: US District Eastern Michigan

Case No.: 2:15-cv-12738

Judge: Mark A Goldsmith

Notes :

# New Lawsuit Check List

**Instructions: Put a check mark in the box next to each appropriate entry to be sure you have all the required documents.**

| ☑ | Two (2) completed **Civil Cover Sheets.** | |
|---|---|---|
| ☑ | Enter the number of defendants named in your lawsuit in the blank below, add 2 and then enter the total in the blank.<br><br>_____ + 2 = __6__ **Complaints.**<br># of Defendants       Total<br><br>Received by Clerk: _NA_   Addresses are complete: _NA_ | Case:2:16-cv-13905<br>Judge: Tarnow, Arthur J.<br>MJ: Grand, David R.<br>Filed: 11-03-2016 At 10:46 AM<br>CMP HARNDEN V. BROWN ET AL (DA) |
| ☐ | If any of your defendants are **government agencies:**<br>Provide two (2) extra copies of the **complaint** for the U.S. Attorney and the Attorney General. | |

| **If Paying The Filing Fee:** | **If Asking That The Filing Fee Be Waived:** |
|---|---|
| ☐ Current new civil action filing fee is attached.<br><br>Fees may be paid by check or money order made out to:<br><br>***Clerk, U.S. District Court***<br><br>Received by Clerk: _NA_   Receipt #: _DET 097679_ | ☐ Two (2) completed **Application to Proceed in District Court without Prepaying Fees or Costs** forms.<br><br><br>Received by Clerk: _____ |

### Select the Method of Service you will employ to notify your defendants:

| **Service via Summons by Self** | **Service by U.S. Marshal**<br>(Only available if fee is waived) | **Service via Waiver of Summons**<br>(U.S. Government cannot be a defendant) |
|---|---|---|
| ☑ Two (2) completed **summonses** for each defendant including each defendant's name and address.<br><br><br><br>Received by Clerk: _NA_ | ☐ Two (2) completed **USM – 285 Forms** per defendant, if you are requesting the U.S. Marshal conduct service of your complaint.<br><br>☐ Two (2) completed **Request for Service by U.S. Marshal** form.<br><br>Received by Clerk: _____ | ☐ You need not submit any forms regarding the Waiver of Summons to the Clerk.<br><br>Once your case has been filed, or the Application to Proceed without Prepaying Fees and Costs has been granted, you will need:<br>• One (1) **Notice of a Lawsuit and Request to Waive Service of a Summons** form per defendant.<br>• Two (2) **Waiver of the Service of Summons** forms per defendant.<br><br>Send these forms along with your filed complaint and a self-addressed stamped envelope to each of your defendants. |

### Clerk's Office Use Only

Note any deficiencies here:

Rev. 4/13